**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DENNIS E. SPECTOR, et al., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:06-cv-129(JCH) |
| BOARD OF TRUSTEES OF | : | |
| COMMUNITY-TECHNICAL | : | |
| COLLEGES; et al., | : | |
| Defendants. | : | DECEMBER 27, 2007 |

**RULING RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 89)**

The plaintiffs, Dennis E. Spector and James A. Crowley, bring this action against

the defendants, the Connecticut Board of Trustees of Community-Technical Colleges

("CTC Board of Trustees"), Naugatuck Valley Community College ("NVCC"), Richard

Sanders, Patricia Bouffard, Mitchell Holmes, Arthur Dubois, Joseph Cistulli, Edward

Connole, William Rimick, and Arian Gorishti (collectively, "Defendants"), under 42

U.S.C. §§ 1983, 1985, and 1986; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e; Article First §§ 3 and 20 of the Connecticut Constitution, Connecticut General

Statutes §§ 31-51q, 52-571b, 46a-60(a)(4); and the Connecticut common law.  This

action is based upon the defendants' alleged attempts to infringe upon the free exercise

of religion and academic expression by Crowley, and their retaliatory acts against

Spector for defending Crowley.

The Defendants have moved for summary judgment as to all of Plaintiffs' claims.

For the reasons stated below, the Defendants' motion is granted in part and denied in

part.

## I.    BACKGROUND[1]

### A.    Parties

Crowley's employment at NVCC began in 1971.  Crowley became a priest in the Holy Apostolic Catholic Church of the East in 1998.  Since becoming a priest, Crowley has worn his clerical collar while at NVCC and is referred to by some students and employees of NVCC as "Father Crowley."

Spector is a tenured professor in the Business School at NVCC and has been the "Program Coordinator" since 1996.  His duties as Program Coordinator include supervising and evaluating faculty and staff.  At all times relevant to this action, Spector has been Crowley's supervisor.

Richard Saunders served as president of NVCC at all times relevant to this action.  Patricia Bouffard served as Dean of Learning and Student Development from 2001, until August of 2006, when she became Dean of Academic Affairs.  AJ DuBois has been employed at NVCC since January 2000 and has been Director of Human Resources for all times relevant to this action.  Joseph Cistulli served as the Dean of Learning and Student Development at NVCC until his retirement on September 1, 2001.  Mitchell Holmes has served as the Academic Division Director of the NVCC Business Division for all times relevant to this action.  In that capacity, Holmes is Spector's immediate supervisor and is also responsible for the supervision of Crowley.  Edward Connole worked at NVCC between 1995 until his retirement in 2006, at which

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the parties and supported by evidence as true, and resolves disputed facts in favor of the non-moving party, where there is evidence to support its allegations.

point he was a "Lieutenant" of the NVCC Public Safety Department. William Rimick and Arian Gorishti were Police Officers with the NVCC Public Safety Department at all times relevant to this action. Marc Herzog is Chancellor of the Connecticut Community College System.

**B.    Facts**

### 1.    Crowley's promotion and CHRO complaint

The dispute between the parties dates back to 2001, when Crowley applied for a promotion from "Associate Professor" to "Professor." Crowley's promotion was denied. On May 17, 2001, Crowley met with President Saunders and AJ DuBois to discuss his concern that the denial of his promotion was "due to improper contractual criteria," namely his status as a Catholic and a priest. Def.'s 56(a)(1) Stat. at ¶¶ 40-1 (Doc. No. 89). On November 15, 2001, Crowley filed a Complaint with the Connecticut Commission on Human Rights and Opportunities (the "CHRO"). Spector provided Crowley with a "documented statement of the discrimination for submission with Crowley's November, 2001 CHRO complaint." Pl.'s Mem. at 4. He was also present for a CHRO fact-finding hearing, which was scheduled to take place in the Spring of 2002 regarding Crowley's complaint, but the hearing did not go forward as the complaint was settled. Id. Professor Crowley applied again for Promotion to Professor on December 14, 2001. He was promoted to Professor by President Saunders on May 20, 2002.

### 2.    Rimick's visit to Crowley's classroom regarding student counseling

On October 25, 2002 and October 28, 2002, Spector and Crowley, respectively, requested a formal investigation into an incident where NVCC Police Officer William Rimick visited Crowley's classroom to question him. The questioning stemmed from an

earlier incident where Crowley had called the NVCC Police Department to report that one of his former students was going to kill herself. Crowley eventually accompanied this student to the hospital. After speaking with the student, Police Sergeant Toni Rinaldi became concerned that Crowley was "counseling" the student, and referred the matter to Lieutenant Connole and Human Resources. Def.'s 56(a)(1) Stat., ¶ 65.

On October 24, 2002, Officer Rimick went to Crowley's classroom at the end of class when the students were leaving, to speak with him about the incident.[2] See Def.'s 56(a)(1) Stat. at ¶ 70. After Officer Rimick left, Crowley and Spector spoke about the incident outside the classroom for a few minutes before Spector began his class in the same classroom. Dean Colwell conducted an investigation into the incident. On January 27, 2003, President Sanders responded to plaintiff's request for investigation, informing them that he had concluded Officer Rimick's actions had not constituted "serious misconduct or abuse of police powers." Def.'s 56(a)(1) at ¶ 80. President Sanders further made a recommendation to Public Safety that they try to schedule

---

[2]Plaintiffs dispute the assertion that class was over and in support of their position direct the court to Plaintiffs' Tabs A & B and Ex. 12. See Pl.'s 56(a)(2) Stat. at ¶ 69 (sic). Plaintiffs' Tabs A and B are Affidavits by Spector and Crowley, respectively. Local Rule 56(a)(3) requires that

> "[e]ach statement of material fact . . . in an opponent's Local Rule 56(a)(2) Statement, must be followed by a specific citation . . . [t]he "specific citation" obligation of this Local Rule requires counsel . . . to cite to specific paragraphs when citing affidavits . . . and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length. Counsel . . . are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)(1) . . . ." Local Rule of Civil Procedure 56(a)(3).

The two depositions are over 31 pages in total length. See Pl.'s Ex. A and B. Therefore, 56(a)(2) denials, such as this one, not supported by a "specific citation" as required by the Local Rule will be deemed admitted by the plaintiffs.

interviews at times and places that would have minimal effect on the educational process.  Unsatisfied with the results of the investigation, Crowley and Spector sent a memo with "four requests" to DuBois suggesting that the incident was in retaliation for having filed a CHRO complaint.  DuBois responded to that memo on April 15, 2003, specifically denying that the management of the College was retaliating against either Crowley or Spector.

### 3.    Crowley's Settlement of the CHRO complaint

On April 21, 2003, Crowley signed an "Agreement and Release in Settlement" (the "Agreement") of the CHRO complaint he filed on November 15, 2001.  In the Agreement, Crowley's salary was increased to that of a full professor as of March 26, 2003 and he was paid $3000.  <u>See</u> Agreement and Release of Settlement, Def.'s 56(a)(1) Stat. at Ex. 29, ¶¶ 3 and 4.  The Agreement states in relevant part that,

> [t]he payment of the above-described amounts shall be in full and complete satisfaction of any and all claims for injunctive relief, damages, costs, and fees, including attorney's fees, which the complainant has or may have based upon the allegations of the complaint filed herein."  <u>Id.</u> at ¶ 5.

It states that in consideration of the terms and conditions of the Agreement, Crowley "completely releases and forever discharges" claims "on any matter from the beginning of time to and including the effective date of this Agreement, including those matters which have been raised or could have been raised in any way, growing out of any incidents which are the subject of the complaint and all related pleadings" in the CHRO complaint.  <u>Id.</u> at ¶ 7.  The Agreement states that "Complainant represents that he understands that he is releasing claims that he may not know about, and that he intends to release such claims."  <u>Id.</u> at ¶ 8.  It further states that,

> THIS MEANS THAN, BY SIGNING THIS AGREEMENT, COMPLAINANT WAIVES <u>ANY</u> RIGHT HE NOW HAS OR EVER HAD TO BRING OR MAINTAIN A LAWSUIT OR MAKE <u>ANY AND ALL</u> LEGAL CLAIMS WHATSOEVER, AGAINST THE RELEASEES, INVOLVING ANY MATTER ARISING OUT OF ANY KNOWN OR UNKNOWN ACT OR OMISSION OCCURRING BEFORE THE DATE OF THE EXECUTION OF THIS AGREEMENT.

<u>Id.</u> (capitalization and emphasis in original).  The Agreement also states that, "Respondent is aware of its obligation and will continue to comply with the various state and federal laws that prohibit discrimination, and prohibit retaliation for the filing of employment discrimination complaints."  <u>Id.</u> at ¶ 9.  Between April 21, 2003 and January 23, 2006, when the Complaint in this case was filed, Crowley did not file any CHRO complaints against NVCC.

### 4.  Crowley's involvement in extra-curricular student clubs

Sometime in 2006, Crowley resigned as the faculty advisor to the Alpha Beta Gamma club, which is an honor society for business.  Crowley resigned when the Dean dealt exclusively with a club co-advisor concerning club matters.  <u>See</u> Pl.'s 56(a)(2) Stat. at Tab B, ¶ 59-60.   He saw her refusal to speak with him on club matters as harassment.  <u>Id.</u>  Crowley also states that the administration of NVCC put him "in a position of fear" by asking questions about the functioning of the Newman Club, a Catholic student club at NVCC, to which Crowley was an advisor.

### 5.  Spector's traffic stop by the NVCC police and workplace violence investigation

On December 11, 2001, Spector was stopped by Police Officer Arian Gorishti and given a written warning.  While the basis of the stop is unclear from the ticket itself, Defendants assert it was for failing to stop at two stop signs, and Spector admits that he

did not stop at the stop signs.  <u>See</u> Def.'s 56(a)(1) at ¶¶ 108 and 110, Def.'s 56(a)(1)

Stat. Ex. 30, and Deposition of Spector ("Spector Depo."), Def.'s Ex. A at 75.  During the

stop, Spector states that he believes the officers "looked into the car through the

window, the back seat and the other areas," but that they did not ask him to open any

part of the car or trunk for further inspection.  Spector Depo. at 85.  During the stop,

Officer Gorishti claims that Spector said, "What the fuck are you going to do now, search

my trunk for the dead body, or you want to search my body cavities? You people have

become the NKVD."  Def.'s 56(a)(1) Stat., Ex. 31.  On December 12, 2001, Lieutenant

Connole emailed Dean Colwell reporting that two of his officers had been subjected to

verbal abuse by Spector and requesting an apology.  <u>See</u> Def.'s 56(a)(1) Stat., Ex. 33.

On December 19, 2001, Holmes, at the direction of Human Resources, asked

Spector to submit a written sequence of the events that occurred on December 11,

2001.  Spector submitted his version of events on January 11, 2002.  DuBois conducted

an investigation into Spector's alleged inappropriate behavior and sent Spector a memo

concluding that he had been "less than candid and forthcoming" in describing his own

behavior that night, that his response to the officers was "inappropriate," "inexcusable,"

and "might well be viewed as a violation of the Governor's Executive Order and the

Chancellor's policy on Workplace violence."  Def.'s 56(a)(1) Stat., Ex. 38.  He went on to

offer Spector information about the Employee Assistance Program and to state that the

memo "was not a disciplinary action," and that it would not be put in Spector's

professional file.  <u>Id.</u>

Spector and DuBois traded further correspondence about the incident, which

culminated in Spector's filing a CHRO Complaint on April 8, 2002, claiming that the

traffic stop "along with many other incidents" were done "in retaliation for my having assisted Father Jim's complaint against the respondent." CHRO complaint, Def.'s Ex. 47. This complaint was dismissed on August 19, 2004. On December 18, 2004, Spector's Request for Reconsideration of the Dismissal of his CHRO complaint was granted. Spector submitted amended complaints on February 15, 2004 and April 30, 2005, alleging that the retaliation included additional acts. Defendants submitted a Verified Answer to these complaints on June 7, 2005.

### 6. Spector's inquiry into the 2002 Promotion Committee

Spector served as the recording Secretary for the NVCC Promotion Committee in the Spring of 2002. On February 19, 2002, Spector memorialized the minutes of a meeting in which he detailed a conversation regarding a rumor that Spector was representing Crowley in his CHRO complaint, and whether such representation created a conflict with Spector's position on the Promotion Committee. On February 23, 2002, another professor, Jennie Seely, prepared amended minutes for that meeting after the committee found that Spector's lengthy minutes regarding the rumor were "irrelevant and inappropriate" and not "business related." Def.'s 56(a)(1) Stat., Ex. 61. On March 6, 2002, Spector wrote to DuBois requesting an investigation into his allegations of impropriety regarding the Promotion Committee. On April 18, 2002, President Sanders reported to Spector that "nothing occurred regarding the alleged committee contacts that was prejudicial to any candidate for promotion." Def.'s 56(a)(1) Stat. at ¶ 163. Spector contends that Sanders' investigation into this incident was not impartial or unbiased. Pl.'s 56(a)(2) at ¶ 162.

### 7. Officer Connole's Alleged Threatening Statements about Spector and Crowley

Plaintiffs allege that Officer Connole told the officers of the NVCC to "get" Spector and Crowley and that they were crazy. See Pl.'s 56(a)(2) Stat. of Disputed Facts at ¶ 119. In support of this contention, Plaintiffs offer an unsworn affidavit from James Blalock, who asserts that Connole told his officers at a meeting in late 2002 regarding Crowley and Spector "a) To stay [sic]way from them, they are trouble and you can't talk to them because they are crazy; b) I will take care of them; c) I'll get them; and d) they are up to no good." Pl.'s 56(a)(2) Stat., Aff. of James Blalock, Ex. K at ¶ 3. They also offer an affidavit from Peter Cisek stating that Blalock had told him the same thing in November 2002, and he had reported it to Crowley and Spector. See Pl.'s 56(a)(2) Stat., Aff. of Peter Cisek, Ex. H at ¶¶ 5,8,and 9.

### 8. Letters of Reprimand to Spector

On October 13, 2004, Dean Bouffard issued a Letter of Reprimand to Spector for "Absence from Professional Staff Meetings." Def.'s 56(a)(1), Ex. 70. Bouffard issued the identical letter to Duane Perkins on the same date. Def.'s 56(a)(1), Ex. 69. The letter of reprimand was eventually replaced with a letter of counseling. The letter of counseling was removed from Spector's personnel file and not replaced.

### 9. Honor Societies

On April 7, 2004, Spector resigned as the faculty advisor to Phi Theta Kappa, an NVCC Honor Society. He wrote a memo to Dean Bouffard explaining that he found her request for a "fact finding meeting" was "more harassment and creation of a hostile work environment," whereas he would not have felt that way had she requested only an

"informal meeting." Def.'s 56(a)(1) Stat., Ex. 75. On July 12, 2006, Spector and Crowley resigned as faculty advisors to the Alpha Beta Gamma honor society.

          10.   Office Moves

Until 2004, Spector and Crowley shared two offices between them on the sixth floor of Eckstrom Hall. They were the only Business Division professors located there. On June 22 and 23, 2003, Dean Bouffard wrote to Spector and Crowley, respectively, indicating that it would be necessary to relocate his office. On June 25, 2003, Plaintiffs wrote to Bouffard contesting the move and again on July 10, 2003 to follow up. On July 15, 2003 Bouffard sent an email to Joanne Ottman and Mitchell Holmes explaining that she had determined that Spector and Crowley would only have to vacate one of the two offices, and that they had indicated to her that they accepted this compromise. On July 16, 2003, Spector wrote to Bouffard expressing that both he and "Father Jim" were "glad that we had settled the office issue". Def.'s 56(a)(1) Stat., Ex. 85 at 1. He further made a list of what the two "would like done for the move," including replacing a door with a wall, moving a couch, extending bookshelves, and moving Crowley's computer and phone. Id. at 2. Bouffard responded to Plaintiffs June 25 and July 10 memos on August 4, 2003. See Def.'s 56(a)(1) Stat., Ex. 86. On August 20, 2003, Spector sent an email to Holmes outlining how and what to move.

An office on the 5th Floor of Eckstrom Hall, where the Business Division was located, was offered to Spector and Crowley in the summer of 2003. That office remained vacant until it was given to a more junior faculty member in January 2004. See Spector Depo., at 274. On July 31, 2004, Bouffard informed Crowley and Spector that they would have to move from the six floor to the fifth floor to accommodate the

expansion of the Allied Health, Nursing and Physical Education Division. At the same time, another professor was required to move into a smaller office.

Spector and Crowley vacated their office and were moved to the fifth floor in August 2004. Spector moved to an office without a window, and Crowley moved into an office shared with another professor. Spector's new office was larger than seven out of seventeen faculty offices on that floor and at least six other offices in the building are shared by two faculty members. Spector kept the office for himself, but allowed Crowley to store some items there.

On October 6, 2004, Spector sent a memo to Bouffard requesting an "ADA based accommodation" for an office with "windows and an excellent air flow" to accommodate his allergies. In response, Bouffard "initiated the paperwork" to have an air purifier installed in Spector's office. Def.'s 56(a)(1) Stat., Ex. 94. On October 26, 2004, Spector emailed Bouffard asking why he could not be moved to an office in another building, or to newly available offices in the same building. Def.'s 56(a)(1) Stat., Ex. 95. On February 9, 2005, Spector wrote to Bouffard requesting a meeting to discuss what he perceived to be ongoing harassment, including the office move.

On February 13, 2006, Bouffard wrote to Spector indicating that she agreed that his desk appeared shorter than a typical desk, and that he could exchange it for another one. On February 22, 2006, Spector wrote to Bouffard objecting to her February 13, 2006 memo, arguing that she had known about his short desk since February 9, 2005. There is no mention of office furniture in the February 9 memo, though there were pictures of the offices, including the furniture, attached to the memo.

11. <u>Surveillance of Crowley's Classroom</u>

Crowley complains that between 2001 and sometime in 2006, Officers Rimick and Gorishti would drive their police car around the building where Crowley's class was held, observing the class from the car. <u>See</u> Pl.'s 56(a)(2) Stat. of Disputed Facts at ¶ 120. The would also park the car outside the window of the classroom and observe. <u>Id.</u> Crowley submits five letters from students, which are not addressed to anyone, stating that they were distracted or bothered by the surveillance. <u>See</u> Pl.'s 56(a)(2) Stat., Ex. 20. Spector wrote a memo to Holmes on November 18, 2002, requesting that the rumor that Connole had threatened to "get" them be investigated and citing as support for the need for the investigation, that the "public Safety department is always driving by our class in the "T-Buildings." Pl.'s 56(a)(2) Stat., Ex. 35. An investigation was conducted into these allegations; Crowley and Spector complained that the investigation was not fair, but no follow-up investigation of the investigation was conducted. <u>See</u> Pl.'s 56(a)(2) Stat. of Disputed Facts at ¶ 125.

## II.  STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>White v. ABCO Engineering Corp.</u>, 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," <u>Anderson</u>, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  <u>Anderson</u>, 477 U.S. at 255; <u>Graham</u>, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  <u>Carlton</u>, 202 F.3d at 134.  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  <u>Sologub v. City of New York</u>, 202 F.3d 175, 178 (2d Cir. 2000).

**III.    DISCUSSION**

A.    Spector's Title VII Claim (Count Three)

Spector brings a claim against defendants CTC Board of Trustees and NVCC for discriminatory retaliation in violation of the Civil Rights Act of 1964.  <u>See</u> Complaint at 29.  The <u>McDonnell Douglas</u> burden-shifting analysis applies to a plaintiff's claim of retaliation.  See <u>Terry v. Ashcroft</u>, 336 F.3d 128, 141 (2d Cir.2003).  Under this framework, a plaintiff makes a prima facie showing of retaliation by establishing "participation in a protected activity known to the defendant; an employment action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse employment action." <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 769 (2d Cir.1998) (quoting <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1308 (2d Cir.1995)).  Within the context of Title VII claims, a " 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 566 (2d Cir.2000) (citing 42 U.S.C. § 2000e-3).  Once a plaintiff has satisfied his prima facie burden, the burden of production shifts to the defendant to articulate a legitimate,6

non-discriminatory basis for its action. <u>See</u> <u>Feingold v. New York</u>, 366 F.3d 138, 157 (2d Cir.2004).  The burden then shifts back to the plaintiff "to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation."  <u>Raniola v. Bratton</u>, 243 F.3d 610, 625 (2d Cir. 2001).

Defendants argue that summary judgment should enter as to Spector's Title VII claim because he cannot establish that he was subjected to an adverse employment action.  <u>See</u> Def.'s Mem. at 35-8.  Spector responds that,

> [t]he hostile work environment began on Dec. 11, 2001 with a workplace violence investigation and has continuously permeated Spector's professional activities in an unending severe manner until Spring 2005 with false disciplinary letters and Feb. 13, 2006 with Spector finally receiving furniture for his office.  The totality of the events reach the level of dissuading a reasonable person from opposing discrimination.

Pl.'s Mem. at 27.  Spector does not cite to a single case to support this proposition.[3]  <u>Id.</u>

The Supreme Court has pronounced that an adverse employment action must be "materially adverse," in that it would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, --- U.S. ----, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006).  Material adversity must be the focus in determining whether an adverse employment action has occurred because "it is important to separate significant from trivial harms."  <u>Burlington Northern</u>,

---

[3]Following this assertion Spector refers the court to "2. Continuing Violation Theory, footnote 11."  Pl.'s Mem. at 27.  The court assumes that this is a typographical error, and that Spector intends to direct the court to footnote 12, which is contained in the section headed "Continuing Violation Theory."  <u>See</u> Pl.'s Mem. at 28.  Footnote 12 is a two and one-half page recounting of the entire history of both Crowley and Spector's claims.  <u>See</u> Pl.'s Mem. at 28 n.12.  The court cannot determine from Spector's reference to this footnote, which facts he believes create a material issue of fact as to whether the defendants' actions created a hostile work environment.  Therefore, the court will disregard Spector's apparent reference to footnote 12.  <u>See</u> footnote 8 <u>infra</u> for a discussion of the relevant provisions Federal Rule of Civil Procedure 56.

126 S.Ct. at 2415.  Thus, while the question of whether an employer's actions are materially adverse "will often depend upon the particular circumstances . . . petty slights, minor annoyances, and simple lack of good manners" will normally be insufficient. Id. at ----, 126 S.Ct. at 2415; see also Nugent v. St. Luke's/Roosevelt Hosp. Center, 2007 WL 1149979 at * 8 (S.D.N.Y. Apr. 18, 2007).

Spector identifies a number of events which he claims, taken together, constituted a "hostile work environment."[4]  The court will address each of these events individually before considering them in the totality.  The first action Spector identifies as an adverse employment action was the workplace violence investigation concluded in December 11, 2001.  See Section 1.B.5, supra.  The result of this investigation was a letter to Spector in which the college "cautioned" him not to engage in similar behavior in the future, "reminded" him that the college had an Employee Assistance Program for employees suffering from personal problems, and further stating that "[t]his memorandum is not considered a disciplinary action."  Def.'s 56(a)(1) Stat., Ex. 38.  Given that Spector acknowledges using hostile and offensive language during this incident, no reasonable trier of fact could find that receiving such a letter constitutes anything more than a trivial harm to Spector.

_____

[4]The court notes that Spector makes reference to a "hostile work environment" twice in his Memorandum in Opposition.  See Pl.'s Mem. at 27 and 33.  In the first instance he contends that the hostile work environment "began on December 11, 2001 with a workplace violence investigation and has continuously permeated Spector's professional activities in an unending severe manner until Spring 2005 with false disciplinary letters and Feb 13, 2006 with Spector finally receiving furniture for his office." Id. at 27.  He later writes that his hostile work environment claim is supported by a "litany of acts" that are "virtually the same as Crowley's," with the addition of several acts that he identifies.  Id. at 33.  Given that neither of these arguments outlines exactly which actions Spector considers to be relevant to his hostile work environment claim, the court will consider only those actions that Spector specifically identifies.

Spector complains that he was removed as the Recording Secretary of the Promotion Committee. See Pl.'s Mem. at 30 n. 12. Spector complains, without citing to any evidence, that rumors were circulating around the Committee that "slandered Spector, impugned his integrity and questioned his honesty and veracity which caused Spector to be voted out" of his position. Id. Spector cites no support for the proposition that being removed from his position as Secretary to this Committee was an adverse employment action.

Spector next complains that he received a letter of reprimand on October 13, 2004, regarding his absence from meetings. Spector concedes that this letter was reduced to a counseling letter, and then retracted altogether. While it is doubtful that receiving such a letter would constitute an adverse employment action in the first place, no reasonable trier of fact could find the issuance and subsequent retraction of such a letter to be an adverse employment action.

Spector complains that he was induced to resign as the faculty advisor to the Phi Theta Kappa honor society because Bouffard requested a "fact-finding" meeting with him. See Pl.'s Mem. at 30 n.12. No reasonable trier of fact could conclude that the request for a "fact-finding meeting" regarding a student club would constitute a significant harm. Spector's voluntary resignation as faculty advisor to the Alpha Beta Gamma honor society because he felt that Bouffard was not communicating with him regarding the club's activities similarly does not rise to the level of an adverse employment action. Id.

Finally, Spector contends that being moved from his sixth floor office to the fifth floor office constituted an adverse employment action. While the court sympathizes with

Spector's lament at losing a window in his office, Spector creates no disputed issue of material fact as to Defendants' contention that the move was necessary to accomodate the expansion of another department, that another office had been available that Spector declined, that Spector's office is larger than seven out of seventeen faculty offices on the 5th floor, and that Defendants attempted to accomodate Spector's health related complaints by intsalling an air filtering device. In light of this evidence, no reasonable trier of fact could find that this move would dissuade a reasonable person from pursuing a discrimination claim.[5]

In response to Defendants' argument that none of these actions rises to the level of an adverse employment action, Spector argues that he was subject to an adverse employment action because "the totality of events reach the level of dissuading a reasonable person from opposing discrimination." Pl.'s Mem. at 27. The court disagrees. The Supreme Court has explained that an employer can violate Title VII by creating a "hostile or abusive environment" when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment."[6] Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)(internal quotations omitted). Workplace conduct

_____

[5]Spector also alleges that he was not given a new desk despite "numerous requests." See Pl.'s Mem. at 30 n.12. However, Spector offers no evidence to substantiate his claim that he made such requests, other than the fact that pictures of his office furniture were included in a memo he sent Bouffard. Therefore, the court will not consider whether or not Defendants denied Spector appropriate office furniture in retaliation for protected activity.

[6]The court notes that Spector did not state a claim for hostile work environment under Title VII and uses the standard only as a way to assert that he was subject to an adverse employment action in support of his Title VII retaliation claim.

is not measured in isolation; instead whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; it's severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Clark County School District v. Breeden, 532 U.S. 268, 270-1 (2001)(internal quotations omitted).

Applying the factors identified by the Supreme Court in Breeden, the court concludes that Spector has not demonstrated that any issue of material fact exists as to whether the Defendants' actions created a hostile work environment for Spector. The actions Spector complains about seem numerous when listed seriatim, however, they do not appear so in light of the fact that they span a six year period. Furthermore, none of the actions complained of were severe, physically threatening, or unreasonably interfered with Spector's work performance. It is clear that Spector perceived several of the actions to be humiliating, but his perception of this one factor, alone, is not enough to establish a hostile work environment claim.

In summary, the court concludes that Spector fails to state a prima facie case of retaliation under Title VII because no reasonable trier of fact could conclude that Spector was subject to an adverse employment action. Therefore, Defendants' Motion for Summary Judgment as to Spector's Title VII claim is granted.

B.      Crowley's Pre-Agreement Claims

Defendants argue that any of Crowley's claims arising out of events prior to the Agreement signed April 21, 2003, are barred by the terms of the Agreement releasing Defendants from liability for events prior to the signing date. See Def.'s Mem. in Supp.

of Mot. for Summ. Judg. ("Def.'s Mem.") at 8-12 (Doc. No. 89). Crowley argues that the language in paragraph 9 of the Agreement created a contractual duty not to violate his rights, and that by violating his rights after entering into the Agreement, the Defendants' breached the contract, releasing him from its provisions. See Pl.'s Mem. in Opp. to Mot. for Summ. Judg. ("Pl.'s Mem.") at 10-3 (Doc. No. 109).

Even assuming arguendo that the Defendants did violate Crowley's rights after the Agreement, the court finds that the language of paragraph 9 does not give rise to a breach of contract claim. The plain language of the contract indicates the parties' intention to foreclose future litigation stemming from any acts prior to the date of execution of the Agreement. See Agreement at ¶ 8, Def.'s 56(a)(1), Ex. 30. The court agrees with Defendants' understanding that the clause in Paragraph 9 makes clear that the parties did not intend to limit or foreclose Crowley's ability to complain or bring suit arising from future violations of his rights. Therefore, the court finds that, to the extent any claims stated by Crowley arise out of events occurring before April 21, 2003, these claims are barred by the terms of the Agreement.

C.     Crowley's Title VII Claims (Count One-B and Count Three)

Counts One-B and Three state claims Crowley brings against defendants CTC Board of Trustees and NVCC for violations of Title VII of the Civil Rights Act of 1964. See Complaint at 28-9 (Doc. No. 1). Crowley concedes that he failed to exhaust administrative remedies prior to filing his claim under Title VII. See Pl.'s Mem. at 15. However, Crowley contends that his failure to comply with the exhaustion requirement regarding his post-Agreement claims was excusable for two reasons. See id. at 15-19.

First, he argues that the Defendants are estopped from asserting the affirmative

defense that Crowley failed to exhaust administrative remedies because they "'lulled' Crowley into believing that it would enforce the contract's 'system in place' wording in paragraph nine and then took no steps to insure enforcement." Pl.'s Mem. at 17. Crowley cites Dillman v. Combustion Engineering, Inc., 784 F.2d 57, 61 (2d Cir. 1986), for the proposition that equitable estoppel is appropriate where "the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing his lawsuit." Id. (internal quotation omitted). However, the Dillman court explained that only "bad faith, dilatory actions" such as a bad faith promise to reinstate an employee so that he will delay in filing his EEOC complaint would suffice to entitle a plaintiff to equitable estoppel. The court finds that Crowley has not come forward with sufficient facts to establish an issue of material fact as to the question of whether the CTC Board of Trustees and NVCC engaged in "bad faith, dilatory actions" such that they would be equitably estopped from raising this affirmative defense. Crowley's blanket assertion that "[t]he lack of good faith enforcement of the Agreement began with the intent not to enforce began with the Board and permeated NVCC and its staff and faculty" is not a basis on which a reasonable trier of fact could conclude that Defendants made a bad faith representation to Crowley that "lulled" him into delaying the filing of an EEOC complaint.

Second, Crowley argues that his filing requirement was waived under the "single filing rule" which "provides that where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims arise out of similar discriminatory treatment in the same time frame." Snell v. Suffolk County, 782 F.2d 1094, 1100 (2d Cir. 1986)(internal quotation omitted). The underlying purpose of the

filing requirement, "to give prompt notice to the employer," is adequately served "where two plaintiffs allege that they were similarly situated and received the same discriminatory treatment." Id. (internal quotations omitted).  The question, in assessing the adequacy of a charge for purposes of the single filing rule, is whether "it can fairly be said that no conciliatory purpose would be served by filing separate EEOC charges." Tolliver v. Xerox Corp., 918 F.2d 1052, 1058 (2d Cir. 1990)(internal quotation omitted).

The court finds that the single filer rule does not apply to Crowley's claims because Crowley's claims and Spector's claims do not "arise out of similar discriminatory treatment" such that Spector's EEOC filing would have put the administration on notice of Crowley's complaint.  First, and most importantly, Crowley states a claim under Title VII for discrimination due to his religion; Spector does not.  See Complaint.  Therefore, Spector's filing could not possibly have "given prompt notice" to the Defendants that Crowley intended to bring this type of claim.

Second, while Spector's and Crowley's claims share some events in common, the factual basis of their complaints are more different than alike.  In Snell, the Second Circuit upheld a District Court's determination that black and Hispanic corrections officers, who had not filed EEOC complaints, could join a Title VII claim where they had been subjected to similar racial and ethnic slurs at work as their co-workers who had exhausted administrative remedies prior to filing suit.  See Snell, 782 F.2d at 1097-1101. In contrast, the events Crowley and Spector complain about were too dissimilar to put Defendants on notice that Crowley also had a Title VII claim.  For example, Crowley's claim is based, in part, on the surveillance of his classroom, DuBois' concern that Crowley had been counseling students, and his involvement in the Newman Club.

Spector's claims are based, in part, on his interaction with the campus police regarding stop signs, his removal as secretary of the Promotion Committee, and reprimands he received for missing faculty meetings, none of which directly impacted Crowley. The court finds that the factual basis for Crowley and Spector's claims are not sufficiently related such that the administration would have been put on notice of Crowley's complaint by Spector's filing. Therefore, summary judgment as to Crowley's Title VII claims is granted because of Crowley's failure to exhaust his administrative remedies.

D.    Plaintiffs' section 1983 Claims (Counts One-A, Two, Four, and Five)

1.    <u>Statute of Limitations</u>

Section 1983 claims in Connecticut are limited by a three year statute of limitations. <u>See</u> <u>Lounsbury v. Jeffries</u>, 25 F.3d 131, 134 (2d Cir. 1994). Defendants argue that Plaintiffs' are time-barred from asserting any claims under section 1983 to the extent that those claims are based on actions occurring more than three years ago.[7] <u>See</u> Def.'s Mem. at 40-3. Plaintiffs contend that they may properly base their 1983 claims on actions that took place before January 23, 2003, because the Defendants' alleged breach of the Agreement estops them from raising the statute of limitations as a defense, and alternately, that their section 1983 actions were "continuous violations"

_____

[7]Defendants argue that this statute of limitations should be tolled by looking back three years from the date an individual defendant was served rather than three years from the date of filing the complaint. <u>See</u> Def.'s Mem. at 41. While it is true that the length of the statute of limitations period for a section 1983 action is borrowed from state law, the question of when an action is commenced for a federal law claim is governed by Federal Rule of Civil Procedure 3, which provides that an action in federal court commences when a complaint is filed with the court. <u>See</u> <u>West v. Conrail</u>, 481 U.S. 35, 39 (1987)(holding that "when the underlying cause of action is based on federal law and the absence of an express federal statute of limitations makes it necessary to borrow a limitations period from another statute, the action is not barred if it has been commenced in compliance with Rule 3 within the borrowed period."); FED.R.CIV.P. 3.

and thus could be based on events outside of the limitations period as long as one event in the continuing violation occurred within the limitations period.  See Pl.'s Mem. at 33-4.

The court has already concluded that the language of the agreement does not give rise to a breach of contract claim for Crowley.  See Section III. B, supra.  Therefore, that alleged breach cannot save Crowley's 1983 claims to the extent that they are based on events outside of the limitations period.  Spector claims that he may also base his section 1983 claims on events outside of the limitations period because of the Defendants' alleged breach of the Agreement with Crowley.  See Pl.'s Mem. at 20. Spector argues that, "[w]hen a contract guarantees rights specifically and promises to enforce those laws, when it is breached and the breach involves a party who opposed the discrimination that the Agreement promised to end, that party has a claim."  Id. Spector cites no authority to support this position.  Spector was not a party to the Agreement, and the court has concluded that the language relied on by Spector does not give rise to a breach of contract claim in any event.  Therefore, Spector's section 1983 claims cannot be saved from the statute of limitations based on a breach of contract theory.

Next, the plaintiffs argue that their claims are saved from the statute of limitations under the "continuous violation theory."  In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110-117 (2002), the Supreme Court held that Title VII claims brought under a hostile work environment theory, rather than complaining of a "discrete retaliatory or discriminatory act," could include events that occurred prior to the limitations period.  While the Second Circuit has not yet ruled on the applicability of the continuing violation theory to section 1983 claims, this court has adopted the Third

Circuit's conclusion that the <u>Morgan</u> analysis applies equally to such claims. <u>See</u> <u>O'Connor v. City of Newark</u>, 440 F.3d 125, 128 (2006) ("The principles at work in <u>Morgan</u> apply with equal force to § 1983 claims."); Ruling Re: Defendant's Motion to Dismiss at 30 (Doc. No. 58).

In its Ruling on the Motion to Dismiss, this court held that, "<u>Morgan</u> will not salvage the plaintiffs' due process and abuse of criminal process claims," noting that "the plaintiffs' never identify the factual allegations upon which these counts rely." <u>Id.</u> Spector and Crowley attempt to resuscitate their continuing violation theory under <u>Morgan</u> by identifying facts that they argue would establish a continuing violation claim, though only for their abuse of criminal process claim and not their other claims under 1983.[8] <u>See</u> Pl.'s Mem. at 37-8.

In support of his continuing violation argument in regards to his abuse of process claim, Spector points to the events surrounding his traffic stop by the NVCC police and the resulting workplace violence investigation (<u>see</u> Section III.B.5, <u>supra</u>), "Connole's comment to his officers to get Crowley and Spector," Spector's contention that Connole

_____

[8]Plaintiffs also put forward an additional argument to support their continuous violation theory. <u>See</u> Pl.'s Mem. at 34. They contend that "the continual involvement of Dubois, Connole and Bouffard under the leadership of Sanders . . . created an unbroken conspiratorial chain of events perpetrated by the same persons. And that command chain is the underlying proof of continuity and is an act in and of itself of 'continuous violation'." <u>Id.</u> However, plaintiffs offer no factual or legal support for this theory, and the court will therefore not address it. <u>See</u> Federal Rule of Civil Procedure 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

carried a folder with Spector and Corwley's name on it into the cafeteria,[9] and the administration's refusal to investigate the police for these actions. Pl.'s Mem. at 37-8. The court finds that even resolving all ambiguities in favor of the non-moving party, that no issue of material facts exists as to whether these events rise to the level of a hostile work environment.  As discussed above, a hostile work environment is determined by looking at the "frequency of the discriminatory conduct; it's severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  <u>Clark County School District v. Breeden</u>, 532 U.S. 268, 270-1 (2001)(internal quotations omitted).  No reasonable fact finder could conclude that the slights complained of here were frequent, severe, physically threatening, or that they unreasonably interfered with Spector's work performance.  Spector's abuse of process claim does not rise to the level of a continuing violation, and therefore, he may not base that claim on events that took place prior to January 23, 2003.

In support of his continuing violation claim, Crowley points to the letter he received from DuBois "warning him not to engage in personal counseling," the "seizure" of his classroom on October 24, 2002, Connole's command to "get" Crowley and Spector around November 2002, the surveillance of Crowley in his classroom, and the failure of the administration to investigate the NVCC for these actions.  <u>See</u> Pl.'s Mem.

---

[9]Spector cites to this incident as being relevant to his continuing violation theory, but makes no reference to any factual support for it contained in his 56(a)(2) Statement, nor does he refer to this "incident" at all in the facts section of his memo, or the voluminous footnote 12. <u>See</u> Pl.'s Mem. at 1-10, 28-30, at 38.  Without reference to factual support for this contention, the court will not consider it.  <u>See</u> n. 8, <u>supra</u> for a discussion of the relevant provisions of Federal Rule of Civil Procedure 56.

at 37-8.  The court has already concluded that Crowley is prevented from raising complaints based on events that took place prior to April 21, 2003 under the terms of the Agreement.  <u>See</u> Section III.B, <u>supra</u>.  Therefore, Crowley cannot use a continuing violation theory claim based on actions that took place before April 21, 2003, to salvage his claims under section 1983.  The only remaining events outside of the period precluded by the Agreement are the surveillance of his classroom and the failure to investigate, which the court will examine further with respect to Crowley's abuse of process claim.

2.      <u>Plaintiffs' Abuse of Process Claim</u>

Section 1983 liability "may lie for malicious abuse of criminal process."  <u>Cook v. Sheldon</u>, 41 F.3d 73, 80 (2d Cir. 1994).  The elements of such a claim are determined by state law.  <u>Id.</u>  Abuse of criminal process in Connecticut has been defined as "the use of 'legal process against another in an improper manner, or to accomplish a purpose for which it was not designed . . . ."  <u>Smith v. Globe Ford, Inc.</u>  Limited to those events which took place within the statute of limitations under section 1983, Crowley and Spector complain only about the administration's failure to investigate their claims, and the ongoing surveillance of Crowley's classroom.  A "legal process" is "[t]he proceedings in any action or prosecution."  <u>Black's Law Dictionary</u> 1242 (8th ed. 2004).  Neither a failure to investigate nor surveillance constitutes a "legal process" for the purposes of an abuse of criminal process claim.  Plaintiffs have failed to establish an issue of material fact as to whether Defendants violated their rights through abuse of criminal process.  Therefore, Defendants' Motion for Summary Judgment as to Plaintiffs' abuse of process claims is granted.

### 3. Plaintiffs' Due Process Claim

Plaintiffs argue that, "[i]n Count Five of the Complaint, Spector and Crowley allege that the abuse of process alleged in Count Two constitute a denial of due process that changed the terms and conditions of their employment to a hostile work environment." Pl.'s Mem. at 38-9. In support of this contention, Plaintiffs cite Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994), for the proposition that, "[p]rocedural due process forbids the use of legal process for wrongful purpose." Id. Because the court has concluded that no issue of material fact exists as to Plaintiffs' abuse of criminal process claim, and their Due Process claim is entirely derivative of that claim, Defendants' Motion for Summary Judgment as to Plaintiffs' Due Process Claim is granted.

### 4. Plaintiffs' Equal Protection Claim

As Plaintiffs correctly state, the elements of a Title VII claim and an equal protection claim are "generally the same as the elements of the other and the two must stand or fall together."[10] Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004). Because the court has found that Spector failed to establish that a disputed issue of material fact exists as to his Title VII claims, Defendants' Motion for Summary Judgment as to his Equal Protection claims is granted.

In order to establish that he suffered an adverse employment action for the purposes of the Title VII burden-shifting analysis on both of his Title VII claims, Crowley states merely that he "was denied a promotion based on religious discrimination when

---

[10]See discussion of the element of a Title VII claim in Section III. A, supra.

Holmes evaluated him and issued a negative recommendation letter for promotion."[11]

Pl.'s Mem. at 25.  As discussed previously, Crowley already settled any claims arising

from his denial of promotion and his Equal Protection claim cannot rest solely on that

event.  See Section III.B, supra.  Therefore, Crowley has failed to state a prima facie

case for an Equal Protection violation.

     5.     Crowley's First Amendment Claim[12]

     Defendants move for summary judgment as to Crowley's First Amendment

speech and academic freedom claims.  See Def.'s Mem. at 49-60.  Crowley's only

mention of these claims in response relates to his arguments as to why he should be

allowed to state claims based on pre-Agreement events.  See Pl.'s Mem. at 13. Crowley

does not make an argument as to why summary judgment should not be entered as to

these claims.  Therefore, the court deems Crowley's First Amendment claims

abandoned.  The Defendants Motion for Summary Judgment as to Crowley's First

Amendment claims is granted.[13]

---

[11]Following this sentence, Crowley writes: "(See: 2. Continuing Violation Theory, footnote 11)".  Pl.'s Mem. at 25.  The court assumes that this is a typo and is not a reference to footnote 11, which collects cases regarding adverse employment actions, but a reference to footnote 12.  Footnote 12 is a two and one-half page recounting of the entire history of both Crowley and Spector's claims.  See Pl.'s Mem. at 28 n.12.  The court cannot determine, from Crowley's reference to this footnote, which facts he believes create a material issue of fact as to whether he suffered an adverse employment action under the standard of Title VII.  Therefore, the court will disregard Crowley's reference to footnote 12.

[12]Defendants devote several pages of their brief to disputing a First Amendment claim by Spector.  See Def.'s Mem. at 49-58.  However, Spector did not state a claim for violation of his First Amendment rights.  See Complaint (especially Count One-A for violation of the First Amendment for Religious Discrimination and Academic Freedom asserted by Crowley)(Doc. No. 1).

[13] Defendants argue that plaintiffs' § 1985 and § 1986 claims fail because their § 1983 claims fail.  See Def.'s Mem. at 69.  Plaintiffs do not address this argument.  See Pl.'s Mem.

E.     Plaintiffs' State Law Claims (Counts One-A, One-C, Three, Four, Six, Seven, Eight, and Nine)

Plaintiffs assert several state law claims.  See Complaint at 27-32.  Under 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right."  United Mine Workers v. Gibbs, 38 U.S. 715, 726 (1966).

While dismissal of the state claims is not absolutely mandatory, Rosado v. Wyman, 397 U.S. 397, 403-05 (1970); Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n. 7 (1988), the basis for retaining jurisdiction is weak when the federal claims are dismissed before trial.  Gibbs, 383 U.S. at 726.  When "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon, 484 U.S. at 350 n. 7; see also DiLaura v. Power Authority of New York, 982 F.2d 73, 80 (2d Cir. 1992); Baylis v. Marriott Corp., 843 F.2d 648, 664-65 (2d Cir. 1988); Indep. Bankers Ass'n v. Marine Midland Bank, 757 F.2d 453, 464 (2d Cir. 1985).

Because this court has granted summary judgment as to all of Plaintiffs' federal law claims, it declines to exercise pendent jurisdiction over all of the their remaining state

---

Therefore, because the court finds that Plaintiffs have not established any issue of material fact that would preclude summary judgment on their § 1983 claims, the court determines that their § 1985 and § 1986 claims are abandoned.

law claims.  Plaintiff's state law claims are therefore dismissed without prejudice.

IV.    **CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment is

GRANTED as to the federal claims in Counts One-A, One-B, Two, Three, Four, and Five

and DENIED as moot as to the state claims in Counts One-A, One-C, Three, Four, Six,

Seven, Eight, and Nine.  The clerk is ordered to close the case.

**SO ORDERED**

Dated this 27th day of December, 2007, at Bridgeport, Connecticut.


 /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge